IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **ANNETTE WILLIAMS,** individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>**MYLER DISABILITY LLC**, a Utah company,<br><br>*Defendant.* | Case no.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff Annette Williams ("Williams" or "Plaintiff") brings this Class Action Complaint and Demand for Jury Trial against Defendant Myler Disability LLC ("Myler Disability" or "Defendant") to stop Myler Disability from violating the Telephone Consumer Protection Act by sending unsolicited, autodialed text messages to consumers, and to otherwise obtain injunctive and monetary relief for all persons injured by Myler Disability's conduct. Plaintiff, for her Complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

## PARTIES

1. Plaintiff Williams is a Charlotte, North Carolina resident.

2. Defendant Myler Disability is a Utah limited liability company with its head office located in American Fork, Utah. Myler Disability does business throughout this District, North Carolina, and the United States.

## JURISDICTION AND VENUE

3. This Court has federal question subject matter jurisdiction over this action under 28 U.S.C. § 1331, as the action arises under the Telephone Consumer Protection Act, 47 U.S.C. §227 ("TCPA").

4. This Court has personal jurisdiction over Defendant and venue is proper in this District under 28 U.S.C. § 1391(b) because Plaintiff resides in this District, and because the wrongful conduct giving rise to this case was directed by Defendant to this District.

## TCPA BACKGROUND

5. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice…to any telephone number assigned to a…cellular telephone service." *See* 47 U.S.C. §227 (b)(1)(A)(iii).

6. According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

7. While "prior express consent" is required for all automated and prerecorded calls, in 2013, the FCC required "prior express written consent" for all such telemarketing calls to wireless numbers and residential lines. Specifically, it ordered that:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e. that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates.[] In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement must be executed as a condition of purchasing any good or service.[]"

2

*In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1844 (2012) (footnotes omitted).

8. "Telemarketing" is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R §64.1200(f)(12).

9. When Congress enacted the TCPA in 1991, it found that telemarketers called more than 18 million Americans every day. 105 Stat. 2394 at § 2(3).

10. By 2003, due to more powerful autodialing technology, telemarketers were calling 104 million Americans every day,. In re Rules and Regulations Implementing the TCPA of 1991, 18 FCC Rcd. 14014, ¶¶ 2, 8 (2003).

11. The problems Congress identified when it enacted the TCPA have only grown exponentially in recent years.

12. Industry data shows that the number of robocalls made each month increased from 831 million in September 2015 to 4.7 billion in December 2018—a 466% increase in three years.

13. According to online robocall tracking service "YouMail," 4.1 billion robocalls were placed in March 2020 alone, at a rate of 132.5 million per day. www.robocallindex.com last visited Apr. 24, 2020).

14. The FCC also has received an increasing number of complaints about unwanted calls, with 150,000 complaints in 2016, 185,000 complaints in 2017, and 232,000 complaints in 2018. FCC, Consumer Complaint Data Center, www.fcc.gov/consumer-help-center-data.

15. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting off Robocalls* (July 22, 2016), statement of FCC chairman.[1]

16. "The FTC receives more complains about unwanted calls than all other complaints combined." Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* Notice of Proposed Rulemaking, CG Docket No. 02-278, at 2 (2016).[2]

## COMMON ALLEGATIONS

17. Myler Disability is a Social Security disability advocate who assists consumers that qualify to receive disability benefits.[3]

18. Part of Myler Disability's marketing plan includes sending text messages *en masse* to consumers that are looking to receive disability benefits.

19. The text messages are solicitations, as Myler Disability is advertising to potential clients their services in exchange for a percentage of the client's social security disability compensation.

20. Consumers have complained about money they have had to pay Myler Disability through websites like Yelp[4] and the Better Business Bureau.[5]

21. The text messages that are sent by, or on behalf of Myler Disability are sent using an autodialer without the necessary prior express written consent that is required.

---

[1] https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls
[2] https://www.ftc.gov/system/files/documents/advocacy_documents/comment-staff-ftc-bureau-consumer-protection-federal-communications-commission-rules-regulations/160616robocallscomment.pdf
[3] https://www.linkedin.com/company/myler-disability/about/
[4] https://www.yelp.com/biz/myler-disability-american-fork
[5] https://www.bbb.org/us/ut/american-fork/profile/lawyers/myler-disability-llc-1166-21000930

4

22. Plaintiff received 2 autodialed text messages to her cellular phone from Defendant asking her to call Myler Disability if she was looking to apply for disability benefits.

23. In response to these text messages, Plaintiff files this class action lawsuit seeking injunctive relief, requiring Myler Disability to cease sending unsolicited, autodialed text messages to consumers' cellular telephone numbers, as well as an award of statutory damages to the members of the Class.

24. In sending the unsolicited text messages at issue, Defendant, or a third party acting on its behalf, used an automatic telephone dialing system; hardware and/or software with the capacity to store or produce cellular telephone number to be called, using a random or sequential number generator. This is evident from the circumstances surrounding the text messages, including the ability to opt out of recurring texts by replying "st0p," the text messages' commercial and generic content, and that substantively identical texts were sent to multiple recipients, which is consistent with the use of an automatic telephone dialing system to send text messages.

25. Myler Disability states in its Privacy Policy that consumers can opt-out of receiving text messages by replying "STOP":

> MYLER DISABILITY     FREE Consultation    Com
>
> Requesting disclosure of the personal information we have collected about you.
> Requesting the portability of your information.
> Opting out from receiving marketing communications that we send you at any time. You can exercise this right by going here and submitting your email address for removal.
> Additionally, you can opt out of any Text (SMS) messages that you may receive by replying "STOP" to be immediately removed.
> Requesting that we not sell your information, by clicking on the link in the footer of our website.
> We will respond to your request as quickly as is reasonably possible, or within the period of time required by law.

---

[6] https://www.mylerdisability.com/privacy-policy/

26. If a consumer fills out a form on the Myler Disability website to see if they qualify for disability benefits, they are consenting to receive calls and text messages from Myler Disability using an automatic telephone dialing system, or autodialer:



27. There are numerous complaints posted online regarding unwanted autodialed calls and text messages that consumers have received from Myler Disability, despite having never provided Myler Disability with consent:

- "Moron Brad Myler from Utah sending TEXTS soliciting social security disability benefits"[8]
- "You have such "fantastic customer service" you have to cold call people? Ha!"[9]
- "Received a call/voice mail from (800) 652-9626 stating it was Myler Disability. I have never applied for disability."[10]

- "I don't understand **how can they know my phone number and texted to me** to ask if I need their help to get disability benefits, It did annoy me very much, Because **I am very healthy person**, and have very successful business and good income, I did not know their website and **did not apply for any disability**

---

[7] https://info.mylerdisability.com/free-case-review/
[8] https://800notes.com/Phone.aspx/1-773-825-9036
[9] https://800notes.com/Phone.aspx/1-800-652-9626
[10] *Id.*

6

**benefits** at all ! Someone can explain to me how Myler Disability know my phone number and name?"[11] (emphasis added)
- "asked about disability"[12]
- "asked if I needed help with my disability!"[13]

**Plaintiff Received an Unsolicited Autodialed Text Message to Her Cell Phone**

28. Plaintiff Williams' cell phone has been registered on the Do Not Call registry since April 20, 2005.

29. Despite, Williams' cell phone number being registered on the Do Not Call Registry, on March 20, 2020 at 1:08 PM, Plaintiff Williams received an unsolicited autodialed text message to her cell phone from Defendant using the phone number 432-223-5618:



30. The unsolicited text message asks Plaintiff to call 1-855-869-2181 to apply for disability benefits.

---

[11] https://www.yelp.com/biz/myler-disability-american-fork
[12] https://www.shouldianswer.com/phone-number/8006529626
[13] *Id.*

31. Based on an investigation conducted by Plaintiff's attorney, when 855-869-2181 is called, and '1' is pressed to apply for disability benefits, an automated system identifies Defendant stating, "You have reached the offices of Myler Disability. I'm Brad Myler. We are a private advocate group that assists people in obtaining Social Security disability benefits…"

32. On April 1, 2020, Plaintiff Williams received a second unsolicited autodialed text message on her cell phone from Defendant using phone number 520-353-8705:



33. The unsolicited text message asks Plaintiff to call 1-888-458-7786 to apply for disability benefits.

34. Based on an investigation conducted by Plaintiff's attorney, when 888-458-7786 is called, and '1' is pressed to apply for disability benefits, an automated system identifies Defendant stating, "You have reached the offices of Myler Disability. I'm Brad Myler. We are a private advocate group that assists people in obtaining Social Security disability benefits…"

35. Plaintiff believes the unsolicited text messages that she received are autodialed because of their generic nature, because the text messages invite the user to reply with "st0p" or "stop" in order to stop the text messages, and because Defendant is open about its use of an autodialer.

36. Plaintiff has not been looking to register for Social Security disability benefits. The text messages are completely irrelevant to her.

37. The unauthorized text messages that were sent by Myler Disability, as alleged herein, harmed Plaintiff in the form of annoyance, nuisance, and invasion of privacy, and disturbed Williams's use and enjoyment of her cellular phone, in addition to the wear and tear on the phone's hardware (including the phone's battery) and the consumption of memory on the phone.

38. The text messages also caused mental duress, as Plaintiff Williams was frustrated by the text message and concerned, as she knows that she was not looking to apply for disability benefits.

39. Seeking redress for these injuries, Williams, on behalf of herself and the Classes of similarly situated individuals, brings suit under the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.*, which prohibits unsolicited autodialed text messages to cellular telephone numbers.

## CLASS ALLEGATIONS

### Class Treatment Is Appropriate for Plaintiff's TCPA Claim

40. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) on behalf of herself and all others similarly situated and seeks certification of the following Class:

> **Autodialed No Consent Class:** All persons in the United States who from four years prior to the filing of this action through class certification (1) Defendant (or an agent acting on behalf of Defendant) text messaged, (2) on the person's cellular telephone number, (3) using the same text messaging platform Defendant used to text message Plaintiff, (4) for whom Defendant claims (a) it obtained prior express consent in the same manner as Defendant claims it supposedly obtained prior express consent to text message Plaintiff, or (b) it did not obtain prior express consent.

9

41. The following individuals are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, its subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) Plaintiff's attorneys; (4) persons who properly execute and file a timely request for exclusion from the Class; (5) the legal representatives, successors or assigns of any such excluded persons; and (6) persons whose claims against Defendant have been fully and finally adjudicated and/or released. Plaintiff anticipates the need to amend the Class definition following appropriate discovery.

42. **Numerosity**: On information and belief, there are hundreds, if not thousands of members of the Class such that joinder of all members is impracticable.

43. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

   (a) whether Defendant used an automatic telephone dialing system to send text messages to Plaintiff and the members of the Autodialed No Consent Class;

   (b) whether Defendant sent the text messages to Plaintiff and the members of the Autodialed No Consent Class without the necessary consent;

   (c) whether Defendant's conduct constitutes a violation of the TCPA; and

   (d) whether members of the Classes are entitled to treble damages based on the willfulness of Defendant's conduct.

44. **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in class

actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and have the financial resources to do so. Neither Plaintiff nor her counsel has any interest adverse to the Class.

45. **Appropriateness**: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class and as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final class-wide injunctive relief appropriate. Defendant's business practices apply to and affect the members of the Class uniformly, and Plaintiff's challenge of those practices hinges on Defendant's conduct with respect to the Class, not on facts or law applicable only to Plaintiff. Additionally, the damages suffered by individual members of the Class will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the members of the Class to obtain effective relief from Defendant's misconduct on an individual basis. A class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

**FIRST CAUSE OF ACTION**
**Telephone Consumer Protection Act**
**(Violations of 47 U.S.C. § 227)**
**(On Behalf of Plaintiff and the Autodialed No Consent Class)**

46. Plaintiff repeats and realleges paragraphs 1 through 45 of this Complaint and incorporates them by reference.

47. Defendant and/or its agents sent unwanted text messages to cellular telephone numbers belonging to Plaintiff and the other members of the Autodialed No Consent Class using an autodialer.

48. These text messages were sent *en masse* without the consent of the Plaintiff and the other members of the Autodialed No Consent Class to receive such text messages.

49. Defendant's conduct was negligent, wilful, or knowing.

50. Defendant has, therefore, violated 47 U.S.C. § 227(b)(1)(A)(iii). As a result of Defendant's conduct, Plaintiff and the other members of the Autodialed No Consent Class are each entitled to between $500 and $1,500 for each and every text message.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Williams, individually and on behalf of the Class, prays for the following relief:

a) An order certifying the Class as defined above, and appointing Plaintiff as the representative of the Class and her attorneys as Class Counsel;

b) An award of actual and/or statutory damages and costs;

c) An order declaring that Defendant's actions, as set out above, violate the TCPA;

d) An injunction requiring Defendant to cease all unsolicited texting activity, and to otherwise protect the interests of the Class; and

e) Such further and other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff Williams requests a jury trial.

          Respectfully Submitted,

          **ANNETTE WILLIAMS**, individually and on behalf of those similarly situated individuals

Dated: May 13, 2020      By: *Ted Lewis Johnson*
          One of Plaintiff's Attorneys

          Ted Lewis Johnson
          tedlewisjohnson@tedlewisjohnson.com

PO Box 5272
Greensboro, NC 27435
Telephone: (336) 252-8596

Avi R. Kaufman*
kaufman@kaufmanpa.com
KAUFMAN P.A.
400 NW 26th Street
Miami, FL 33127
Telephone: (305) 469-5881

*Attorneys for Plaintiff and the putative Class*

*\*Pro Hac Vice motion forthcoming*